[Cite as *In re Z.F.*, 2016-Ohio-7463.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: Z.F.
    D.S.
    M.F.
    B.S.

C.A. Nos.      28246
                  28247

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 14-04-209
                  DN 14-04-210
                  DN 14-04-211
                  DN 14-04-649

DECISION AND JOURNAL ENTRY

Dated: October 26, 2016

MOORE, Presiding Judge.

{¶1}   Appellants, Diane S. ("Mother"), and James F. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB").  This Court affirms.

I.

{¶2}   Mother and Father are the biological parents of the four minor children at issue in this appeal: Z.F., born October 5, 2005; D.S., born December 18, 2008; M.F., born July 11, 2011; and B.S., born September 22, 2014.  CSB has a history with this family dating back to 2008, when the agency received numerous referrals about substance abuse by both parents, domestic violence between them, and the unsanitary condition of their home.

{¶3} During 2009, before the birth of M.F. or B.S., the older two children were removed from the home following substantiated physical abuse of Z.F. by Father. The parents later agreed to an adjudication of both children as neglected children. The case plan in the 2009 case required Father to obtain mental health treatment and both parents to address their problems with substance abuse and domestic violence. Father admitted that he had mental health problems and had taken psychiatric medication in the past, but explained that he was not then taking any medication because he did not like the side effects. Because of Father's abuse of Z.F., a no contact order prohibited him from having any contact with Mother or the children during most of the 2009 case. The children were eventually returned to Mother's custody and Father was permitted to have supervised visits with them. The case was closed by the end of 2009.

{¶4} The record includes only vague facts about the family during the next few years. At some point, the parents rekindled their romantic relationship. During 2011, Mother gave birth to M.F. and CSB opened another case with the family. The record includes no documentation from the 2011 case and little testimony about it except that the children were removed from Mother's custody, Mother engaged in drug treatment, the children were eventually returned to Mother's custody, and the case was later closed. Nevertheless, both parents would later admit that they continued to struggle with heroin addiction for many years.

{¶5} At some point before the current case began, Mother began medically-assisted drug treatment with the prescription drug Suboxone, which curbs cravings for opiates and helps prevent symptoms of withdrawal. According to expert testimony in this case, because Suboxone is a controlled substance that has potential for illegal sale and use, federal law requires that patients in Suboxone programs receive their dose each day directly from a medical provider until

they demonstrate six months of medically-assisted sobriety. It is not until a patient reaches that milestone that they can receive a prescription for Suboxone to administer on their own.

{¶6} For reasons not clear from the record, Mother had a supply of Suboxone pills in her possession when this case began. Although she might have reached the six-month milestone that allowed her to administer her own prescription Suboxone outside of a treatment facility, CSB's evidence suggested that she had not. According to the CSB caseworker, both Mother and Father had been seeing an out-of-county medical doctor who prescribed them Suboxone, but CSB had not approved him as a provider of addiction treatment because the agency believed that he did not appropriately monitor the Suboxone use of his patients.

{¶7} On Saturday, April 5, 2014, Z.F., D.S., and M.F. were removed from Mother's custody pursuant to Juv.R. 6 because M.F. had ingested one of Mother's Suboxone pills and had other symptoms of medical neglect. When M.F. was admitted to the hospital, Mother said that the child had been able to grab one of her pills because Father had dumped the contents of her purse, which included loose Suboxone pills, while she and Father were involved in an altercation.

{¶8} The following Monday, CSB filed complaints to commence the current case. The trial court later adjudicated the children as dependent children, also adjudicated M.F. as a neglected child, and placed all three in the temporary custody of CSB. B.S. was born several months later and was also removed from Mother's custody, adjudicated a dependent child, and placed in the temporary custody of CSB.

{¶9} The case plan in this case again required Mother and Father to consistently address their problems with substance abuse, unstable mental health, domestic violence, and instability in their home. Mother was also ordered to participate in the juvenile court's Family

Reunification Through Recovery Program ("FRRC"), which required her to attend weekly meetings with personnel who had been trained to help parents recover from substance abuse.

{¶10} Shortly after this case began, Father moved to Florida to reside with friends and family there and returned to Ohio only once during the next year. Although Father communicated with the children via some internet video calls, the foster mother terminated at least one of those calls because of Father's erratic and threatening behavior. Despite continual encouragement from the caseworker to do so, Father did not work on the case plan for the next 15 months. He repeatedly told the caseworker that he did not need case plan services and that Mother was the cause of his family's problems.

{¶11} Mother does not dispute that she has a long history of heroin use and a need for treatment to achieve sobriety. During this case, she was again diagnosed with opioid dependence and referred to a drug treatment program. Mother entered several drug treatment programs during the first year of this case, but did not successfully complete any of them. During the second year of case planning services, Mother eventually completed a residential treatment program, but did not develop a sober support system to maintain her sobriety.

{¶12} On August 27, 2015, CSB moved for permanent custody of all four children. Mother alternatively moved for legal custody of the children and Father supported her motion. Following a hearing on the alternate dispositional motions, the trial court terminated parental rights and placed the children in the permanent custody of CSB.

{¶13} Mother and Father separately appealed and their appeals were consolidated. This Court will address their assignments of error together because they are closely related.

II.

**MOTHER'S ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED MOTHER'S PARENTAL RIGHTS AS THE EVIDENCE WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**FATHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT IT IS IN THE MINOR CHILDREN'S BEST INTEREST THAT THEY BE PLACED IN THE PERMANENT CUSTODY OF [CSB] AS THE STATE FAILED TO MEET ITS BURDEN OF PROOF BY CLEAR AND CONVINCING EVIDENCE.

**FATHER'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN GRANTING [CSB'S] MOTION FOR PERMANENT CUSTODY THEREBY TERMINATING THE PARENTAL RIGHTS OF [FATHER] AS THE TRIAL COURT'S FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHICH COULD ONLY LEAD TO ONE CONCLUSION THAT BEING CONTRARY TO THE JUDGMENT OF THE TRIAL COURT.

{¶14} The parents' assignments of error challenge the evidence supporting the trial court's permanent custody decision. Before a juvenile court may terminate parental rights and award permanent custody of children to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the children are abandoned; orphaned; have been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; they or another child in a parent's custody have been adjudicated abused, neglected, or dependent on three separate occasions; or they cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best

interest of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶15} The trial court found that CSB satisfied the first prong of the permanent custody test because, among other reasons, the parents had "failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside [their] home." R.C. 2151.414(E)(1). Because the facts pertaining to each parent are different, we will address Father and Mother separately.

Father

{¶16} The trial court heard overwhelming evidence to support its conclusion that Father had failed to substantially remedy the conditions that caused the ongoing removal of the children from the home. To begin with, Father voluntarily left the state shortly after this case began, lived in Florida for more than one year, and did not return to this area until four months after the permanent custody motion was filed. While Father resided in Florida, he told the caseworker that he did not need to work on the case plan because he blamed the ongoing removal of the children on Mother's drug use. He similarly testified at the hearing that Mother's drug use had caused the family's problems. He also explained that, although he knew that he was required to engage in case plan services, he did not do so because he thought Mother was going to get the children back.

{¶17} Father concedes that he did not begin working toward reunification until shortly before the permanent custody hearing. At the time of the hearing, Father had not complied with the mental health, substance abuse, or domestic violence components of the case plan.

{¶18} Father was diagnosed with bipolar disorder years ago but has not engaged in mental health treatment on a consistent basis. When this case began, he was not taking any

psychiatric medication. At the time of the hearing, Father had been engaging in mental health treatment for only a brief period, but testified that he realized that the medication helped to stabilize his mood swings and his tendency to overact to stressful situations.

{¶19} Father also had a long history of heroin abuse. Since his return to Ohio, he had been taking Suboxone but, according to his own testimony, he was not involved in any drug counseling or sober support services. Moreover, although Mother and Father had attended one session of couples counseling, neither had complied with the domestic violence component of the case plan.

Mother

{¶20} Because Mother spent more time working on the reunification goals of the case plan, most of CSB's evidence focused on her unsuccessful attempts to achieve ongoing sobriety. Mother had attempted to resolve her long-term heroin addiction through two prior cases with CSB and for almost two years during this case. During the past two years, every two to three months, Mother relapsed by using heroin or another illegal drug. The caseworker and the guardian ad litem expressed particular concern that Mother had not developed a sober support network through community programs, such as Alcoholics or Narcotics Anonymous, or the sobriety coaches that were available through the court's FRRC program. The guardian ad litem, who had been trained to assist participants in the FRRC program, testified that having a sober support network was "critical" to Mother's recovery from heroin addiction.

{¶21} In addition to her lack of a sober support network, Mother had not severed ties with her drug-using acquaintances, which had led to her repeated relapses. She also continued to manipulate those around her, particularly her parents, to financially support her and enable her drug use. For example, Mother was prescribed pain medication following the birth of B.S. After

she had taken all of the pills that had been prescribed, Mother persuaded her father to provide her pain medication that had been prescribed to him, not her. Moreover, despite admissions by her parents that they had enabled Mother's drug use by providing her with ongoing financial support, they continued to pay Mother's bills and provide her with money. The caseworker testified that Mother's deceitful and manipulative behavior demonstrated an ongoing pattern of "addictive thinking."

{¶22} The caseworker also expressed concern that, although Mother had admitted to a long history of domestic violence with Father, after he returned from Florida, she rekindled her relationship with him before they had engaged in any domestic violence counseling. Progress notes from Mother's drug treatment programs also reveal that Mother's on and off relationship with Father tended to trigger her heroin relapses.

{¶23} During October 2015, Mother reported during a drug counseling session that she planned to avoid contact with Father to prevent future relapses. The counselor noted "concern" a few days later, however, when Mother reported that she and Father might be getting back together. Mother missed the next two counseling sessions and, after expressing concern at the next session about seeing Father at a court hearing, Mother missed several more counseling sessions and ultimately suffered another relapse by taking Suboxone illegally.

{¶24} During February 2016, Mother attended intensive outpatient therapy on an inconsistent basis and progress notes from that program state that she was minimizing her most recent relapse. By the end of February, Mother was reporting to her drug counselors that she was afraid of relapsing again because she was taking a decreased dosage of Suboxone and Father was back in her life. At the permanent custody hearing approximately one month later, Mother

and Father were back together and Mother had not maintained medically-assisted sobriety for more than a few months.

**{¶25}** The trial court heard undisputed evidence that neither parent had adequately addressed their long-term heroin addiction, problems with domestic violence, or other instability in their lives. Consequently, the evidence before the trial court clearly and convincingly demonstrated that Father and Mother had "failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside [their] home." R.C. 2151.414(E)(1).

**{¶26}** The trial court also found that permanent custody was in the best interests of the children. When determining the children's best interests under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the children, their wishes and custodial history and their need for permanence in their lives. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Although the trial court is also required to consider any relevant factors under R.C. 2151.414(E)(7) through (11), none of those factors applied to the facts of this case. *See id.*

**{¶27}** No one disputed that Mother loved her children, visited them regularly, and that there was a bond between Mother and all of the children. Aside from extended visits with the children while she was in a residential drug treatment facility, Mother's interaction with the children had been limited to short, supervised visits because she had not complied with the substance abuse component of the case plan. Mother was allowed to call or text the foster parents to receive information about the children, but she rarely did.

**{¶28}** Father's interaction with his children was much more limited. He lived in Florida for 15 to 16 months of this two-year case, so he had no direct contact with his children during

that time except for a holiday visit and some internet video calls. After Father returned to this area, his contact with his children was limited to weekly, supervised visits. Because B.S. was born while Father was living in Florida, Father had no relationship with the child throughout the first year of his life. Several witnesses testified that there was no bond between Father and B.S.

{¶29} Z.F. had consistently expressed a desire to return to Mother's custody. As several witnesses explained, however, Z.F. had been exposed to ongoing domestic violence and drug use in Mother's home and, although she had engaged in therapy throughout this case, her counselor opined that she still was not ready to honestly communicate her feelings. D.S. and M.F. were conflicted about where they wanted to live and were also still learning to express their feelings through counseling.

{¶30} Because B.S. was less than two years old at the time of the hearing, the guardian ad litem spoke on his behalf. She opined that permanent custody was in best interest of B.S. as well as the older three children. She expressed particular concern that Father left the state and did not return for more than one year and that Mother had been unable to achieve more than one to two months of sustained medically-assisted sobriety.

{¶31} The custodial history of the older children has included prolonged periods living outside their parents' custody in temporary placements. This case was their third removal from their parents' custody. During this case, the oldest three children had been outside their parents' custody for almost two years by the time of the permanent custody hearing. B.S. was born during this case and had lived in temporary placements for his entire life.

{¶32} All four children were in need of legally secure permanent placement. Neither parent was able to provide them with a suitable permanent home and CSB had been unable to find a relative who was willing and able to do so. Therefore, the trial court reasonably concluded

that permanent custody was the means to provide the children with a suitable permanent placement.

**{¶33}** The parents have failed to demonstrate that the trial court's permanent custody decision was not supported by clear and convincing evidence. Consequently, their assignments of error are overruled.

### III.

**{¶34}** The parents' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

EDWARD T. SMITH, Attorney at Law, for Appellant.

JAMES E. BRIGHTBILL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

DIANE CURTIS, Attorney at Law, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.